IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FIRE PROTECTION SERVICE, INC., | § | |
|    Plaintiff, | § | |
| | § | |
|      v. | § | CIVIL ACTION NO. 4:19-cv-02162 |
| | § | |
| | § | Hon. Judge Nancy F. Atlas, District Judge |
| SURVITEC SURVIVAL | § | |
| PRODUCTS, INC., | § | |
|    Defendant. | § | |

**Survitec's Trial Brief on Applicability and Constitutionality of
Texas Business & Commerce Code § 57.001 *et seq.***

# TABLE OF CONTENTS

Index of Authorities ........................................................................................................ ii

I.  Nature and State of the Proceedings .......................................................................... 1

II.  Issues ......................................................................................................................... 2

III.  Partial Findings of Fact ............................................................................................. 3

IV.  Rule 52(c) Legal Standard ......................................................................................... 3

V.  Summary of Argument ............................................................................................... 4

    A.  The Act's Scope .................................................................................................. 4

    B.  The Act's Constitutionality ................................................................................ 4

VI.  Argument .................................................................................................................... 6

    A.  The Act does not apply to the parties' dealership agreement because Survitec's products are not "Equipment" under the Act. ...................................... 6

        1.  Survitec's products are not "Equipment" as defined under the Act. .............. 6

        2.  Survitec's product are not "Equipment" under the Act as amended in 2019. ........................................................................................................ 7

    B.  The Act would constitute unconstitutional retroactive legislation under the Texas constitution if applied to the parties' dealership agreement. ...................... 8

        1.  The Act ......................................................................................................... 9

        2.  The Act is unconstitutional if applied to the parties' agreement. ................... 10

            a.  The Act is retroactive. ............................................................................ 10

            b.  Retroactive application of the Act to the parties' agreement violates Article I § 16 of the Texas Constitution. ................................................ 13

                i.  The nature of the prior right impaired by the statute: here, the right was longstanding, vested, and mutual. ..................................... 14

                ii.  The extent of the impairment: here, the right was completely eliminated and there was no "grace period" to preserve it. ............. 15

                iii.  The nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings: here, there were no findings. ..................................................................... 18

                    (a)  The "public" interest was not compelling; it was special interest group politics. ................................................................ 19

                    (b)  The Legislature's passage of the Act was unsupported by any factual findings. .............................................................................. 22

VII. Conclusion ................................................................................................................ 24

Certificate of Service ...................................................................................................... 26

# Index of Authorities

## Cases

*Allied Structural Steel Co. v. Spannaus,*
438 U.S. 234 (1978) ................................................................... 16, 21

*Associated Mach. Tool Techs. v. Doosan Infracore Am., Inc.,*
No. 4:15-CV-2755, 2015 WL 13660130 (S.D. Tex. Nov. 24, 2015) (unpub.) ............ 22

*Barshop v. Medina County Underground Water Conservation Dist.,*
925 S.W.2d 618 (Tex. 1996) ................................................................... 20

*Board of Regents v. Roth,*
408 U.S. 564 (1972) ................................................................... 15

*Bob Tatone Ford, Inc. v. Ford Motor Co.,*
197 F.3d 787 (6th Cir. 1999) ................................................................... 11

*Bull Int'l, Inc. v. MTD Consumer Grp., Inc.,*
654 F. App'x 80 (3d Cir. 2016) ................................................................... 24

*Chesapeake Operating, Inc. v. Denson,*
201 S.W.3d 369 (Tex. App.—Amarillo 2006, pet. denied) ......................................... 14

*Century Marine Inc. v. U.S.,*
153 F.3d 225 (5th Cir. 1998) ................................................................... 4

*City of Tyler v. Likes,*
962 S.W.2d 489 (Tex. 1997) ................................................................... 16

*Cloverdale Equip. Co. v. Manitowoc Eng'g Co.,*
149 F.3d 1182 (6th Cir. 1998) (unpub.) ................................................................... 24

*Daly v. River Oaks Place Council of Co-Owners,*
59 S.W.3d 416 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ...................................... 7

*Dickson v. Navarro County Levee Improvement Dist. No. 3,*
139 S.W.2d 257 (Tex. 1940) ................................................................... 7

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.,*
459 U.S. 400 (1983) ................................................................... 21

*Equipment Manufacturers Institute v. Janklow,*
300 F.3d 842 (8th Cir. 2002) ................................................................... 21

*Fairchild v. All Am. Check Cashing, Inc.,*
815 F.3d 959 (5th Cir. 2016) ................................................................... 4

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.,*
452 U.S. 264 (1981) ................................................................... 23

*In re A.V.*,
   113 S.W.3d 355 (Tex. 2003) ....................................................................... 20

*Jack Tyler Eng'g Co. v. SPX Corp.*,
   294 F. App'x 176 (6th Cir. 2008).............................................................. 24

*John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*,
   957 A.2d 595 (Md. 2008) ............................................................................ 12

*Nafta Traders, Inc. v. Quinn*,
   339 S.W.3d 84 (Tex. 2011) ................................................................... 18, 20

*Nelson v. Weatherwax*,
   59 S.W.3d 340 (Tex. App.—Fort Worth 2001, pet. denied)......................... 15

*Northshore Cycles, Inc. v. Yamaha Motor Co.*,
   919 F.2d 1041 (5th Cir. 1990) ................................................................... 12

*Reliable Tractor, Inc. v. John Deere Constr. & Forestry Co.*,
   376 F. App'x 938 (11th Cir. 2010) ............................................................. 12

*Robinson v. Crown Cork & Seal Co.*,
   335 S.W.3d 126 (Tex. 2010) ...........................5, 8, 10, 11, 13, 14, 20, 21, 22

*Sable Communications of California, Inc. v. F.C.C.*,
   492 U.S. 115 (1989) ..................................................................................... 23

*State v. Gibson Products Co., Inc.*,
   699 S.W.2d 640 (Tex. App.—Waco 1985, no writ) ....................................... 8

*Tenet Hosps. Ltd. v. Rivera*,
   445 S.W.3d 698 (Tex. 2014) ................................................................. 11, 16

*Union Carbide Corp. v. Synatzske*,
   438 S.W.3d 39, 58 (Tex. 2014) ................................................................... 16

*Valley v. Rapides Parish School Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ..................................................................... 4

*Vartelas v. Holder*,
   566 U.S. 257 (2012) ..................................................................................... 11

**Constitutions, Statutes, and Rules**

FED. R. CIV. P. 12 ..............................................................................................

FED. R. CIV. P. 52 ..............................................................................................

FED. R. CIV. P. 56 ..............................................................................................

H.B. 3079, 82nd Leg., Reg. Sess. (Tex. 2011), ch. 1039, §§ 1, 4 ..............9, 10, 11, 16, 19

Texas Fair Practice of Equipment Manufacturers, Distributors, Wholesalers and
   Dealers Act ("the Act"), TEX. BUS. & COM. CODE § 57.001 *et seq*.......................*passim*

TEX. BUS. & COM. CODE § 37.154 ....................................................................... 9

TEX. BUS. & COM. CODE § 57.001 ................................................................... 1, 9

TEX. BUS. & COM. CODE § 57.002 ................................................................ 3, 6, 7

TEX. BUS. & COM. CODE § 57.003 ..................................................................... 10

TEX. BUS. & COM. CODE § 57.154 ....................................................................... 9

TEX. BUS. & COM. CODE § 57.155 ....................................................................... 9

TEX. CONST., Art. XVI § 5 ................................................................................ 20

TEX. CONST., Art. I § 16............................................. 1, 2, 5, 10, 13, 22, 23, 24

### Legislative History

Tex. S. Jour., 82nd Leg., Reg. Sess. No. 67 (Tex. May 25, 2011).................................... 18

### Other Authorities

Merriam-Webster Online Dictionary (www.merriam-webster.com).................................. 8

Defendant Survitec Survival Products, Inc. ("Survitec") submits the following trial brief in support of its Motions for Judgment on Partial Findings presented at the bench trial of this matter.

## I.      Nature and State of the Proceedings

Plaintiff Fire Protection Service ("FPS") has claimed that Survitec wrongfully terminated FPS as an authorized dealer of Survitec's marine safety and survival life rafts and parts through a termination letter dated August 15, 2017, effective December 27, 2017. Plaintiffs' claims are based on the Texas Fair Practice of Equipment Manufacturers, Distributors, Wholesalers and Dealers Act (hereinafter, "the Act"), TEX. BUS. & COM. CODE § 57.001 *et seq.*, which sets forth various conditions and limitations on the termination of dealers by suppliers that are subject to the Act.

In prior motions before the Court under Rules 12(b)(6), 52(c), and 56 of the Federal Rules of Civil Procedure ("Rules"), which Survitec incorporates herein by reference, Survitec argued that the Act could not be applied to the dealership agreement that previously existed between it and FPS because (1) Survitec's products are not "Equipment" under the Act;[1] and (2) the Act, if retroactively applied to the parties' agreement (which was entered before the effective date of the Act), would violate Article I § 16 of the Texas Constitution.[2]

---

[1] Doc. No. 5, Survitec's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6); Doc. No. 23, Survitec Survival Products, Inc.'s Motion for Partial Summary Judgment.

[2] Doc. No. 32, Survitec Survival Products, Inc.'s Motion for Partial Summary Judgment or in the Alternative for Judgment on Partial Findings; Doc. No. 33, Defendant Survitec Survival Products, Inc.'s Memorandum of Law in Support if Its Motion For Partial Summary Judgment or in the Alternative Motion for Judgment on Partial Findings; Doc. No. 34, Defendant Survitec Survival Products, Inc.'s Statement of Material Facts in Support of Its Motion for Partial Summary Judgment or in the Alternative for Judgment on Partial Findings.

The Court denied Survitec's Rule 12(b)(6) motion, stating that "the Court cannot conclude as a matter of law that Survitec's life rafts and parts do not fall within the Act's coverage of 'equipment.' " Doc. No. 8 at 7. The Court also denied Survitec's subsequent Rule 56 motion on the issue, concluding that "[f]or purposes of the Act, Survitec's life rafts are equipment that can be used in connection with mining activities. Consequently, they are within the Act's definition of 'equipment' for purposes of coverage under the Act." Doc. No. 26 at 8.   The Court denied Survitec's subsequent Rule 56 motion on the constitutionality issue as untimely (Doc. No. 39 at 3), but stated that "[t]he denial is without prejudice to Defendant raising the issue at trial, if Defendant's arguments are supported by evidence admitted at trial and otherwise appropriate." *Id.*[3]

The bench trial of this matter began today (February 2, 2021), and this brief is submitted in support of Survitec's Rule 52(c) motions for judgment on partial findings that it intends to assert at the close of FPS's evidence and, if necessary, the close of evidence.

## II.   Issues

This brief concerns the following two issues, which Survitec intends to present to the Court through Rule 52(c) motions:

1. Does the Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act ("the Act")  apply to the parties' dealership agreement?

2. If so, does such application of the Act violate Article I § 16 of the Texas Constitution?

---

[3] The Court did not specifically rule on Survitec's alternative request for judgment on partial findings under Rule 52(c).

## III.    Partial Findings of Fact

With respect to the first issue, Survitec's Rule 52(c) motions are premised on the Court making either of the following two findings of fact:

1. Survitec's marine safety and survival life rafts and parts are not "Equipment" under § 57.002(7)(A) of the Act.

2. Survitec's marine safety and survival life rafts are "off highway" vehicles.

With respect to the second issue, Survitec's Rule 52(c) motions are premised on the Court making both of the following two findings of fact:

3. Before September 1, 2011, FPS and Survitec entered a dealership agreement concerning FPS's purchase and servicing of Survitec's marine safety and survival life rafts that was terminable by either party for any reason (*i.e.*, without "cause").

4. Since September 1, 2011, neither party sought to modify or purport to terminate the dealership agreement before Survitec's August 15, 2017 letter informing FPS that it was terminating the parties' agreement effective December 27, 2017.

Survitec expects the evidence adduced at trial may support additional findings of fact relating to the parties' agreement but submits that the above findings are sufficient for a legal determination of the presented issues.

## IV.    Rule 52(c) Legal Standard

Under Rule 52, a court may enter judgment after a party has been "fully heard" on an issue. FED. R. CIV. P. 52(c).  A court entering such judgment must find the necessary facts specially and stating its conclusions of law separately. *Id*. However, this does not require that the court set out findings on all factual questions that arise in a case. *Valley v. Rapides Parish School Bd*., 118 F.3d 1047, 1053-54 (5th Cir. 1997); *Century Marine Inc.*

*v. U.S.*, 153 F.3d 225, 231 (5th Cir.1998) ("Rule 52(a) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." (internal quotations and citations omitted)). Instead, the court is just expected to give a clear understanding of the analytical process by which ultimate findings were reached. *Valley*, 118 F.3d at 1053-54. Importantly, "Rule 52(c), unlike Rule 50, does not require the district court to draw any inferences in favor of the non-moving party and permits the court to make a determination in accordance with its own view of the evidence." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (internal quotation marks omitted)).

## V.     Summary of Argument

### A.     The Act's Scope

For the reasons given in Survitec's prior Rule 12 and Rule 56 motions and incorporated herein by reference, Survitec's marine safety and survival life rafts and parts are not "Equipment" under the Act because they do not relate to any of the purposes enumerated by the Act's definition of equipment.

In addition, Survitec's marine safety and survival life rafts and parts are not "Equipment" under the Act because in 2019, the Legislature amended the Act to exclude "off highway" vehicles from the definition of "Equipment."  Because Survitec's marine safety and survival life rafts and parts are off-highway vehicles, they do not constitute "Equipment" under the Act.

### B.     The Act's Constitutionality

For years, FPS was a dealer for Survitec under an agreement that allowed either party to terminate the agreement at will, for any reason whatsoever. In August 2017,

Survitec exercised that contract right and terminated the agreement. FPS contends that the Act prohibited Survitec from terminating the agreement except for "good cause," which the Act generally defines to include specific breaches of the parties' dealership agreement by the supplier, so long as those breaches involve standards that the supplier also imposes and enforces with respect to its other dealers.

The Act's "good cause" requirement means that a manufacturer can only preserve a meaningful power to terminate a dealership is by creating detailed contractual provisions to regulate a distributor's performance. Moreover, even with such provisions, the Act still prohibits a manufacturer from terminating a dealership agreement if the dealer wants or needs to change its business model or even just wants to leave the geographic or product markets entirely. Thus, if the Act is applied retroactively to the parties' agreement, it bestows unilateral and quasi-property like rights on FPS, thereby trapping Survitec into a potentially permanent relationship it never contemplated and on terms to which it never agreed.

Applying the Act to the parties' preexisting agreement violates Article I § 16 of the Texas constitution, which imposes a "heavy" presumption that retroactive legislation is unconstitutional absent a "compelling" public interest. *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 138 (Tex. 2010).

Here, application of the Act is retroactive because it alters a contractual right – the ability to terminate for any reason – that Survitec had obtained before the Act. And the Act's impact on that right (taking the right away from Survitec while allowing FPS to retain the right) was significant because Survitec's termination right had previously been

longstanding, fundamental to the relationship, and mutual.  Application of the Act would thus entirely eliminate the settled expectation that Survitec had: namely, that it could terminate its relationship with FPS at any time for any reason.  In addition, the Act provides no grace period by which Survitec could have preserved its existing right to have an at-will relationship.

Finally, the Act was unsupported by a compelling public interest for two reasons: first, the Legislature's decision to benefit the economic interests of one group of private businesses interest over those of another is not the type of political choice that constitutes a public interest in the first place, let alone the "compelling" public interest required to overcome the "heavy" presumption against retroactive legislation; second, the Legislature made no evidentiary factual findings that could support such a choice, even if such a choice were a permissible public interest.

## VI.  Argument

### A.  The Act does not apply to the parties' dealership agreement because Survitec's products are not "Equipment" under the Act.

#### 1.  *Survitec's products are not "Equipment" as defined under the Act.*

As plaintiff, it was FPS's burden to establish that the parties' dealership agreement fell with the scope of the Act.  For the reasons explained in Survitec's prior Rule 12(b)(6) and Rule 56 motions (*see supra* note 1), the Act does not cover the parties' dealership agreement because the term "Equipment," as defined in § 57.002(7)(A) of the Act, does not include marine safety and survival life rafts.[4]  In support of this contention, Survitec

---

[4] *See* Act § 57.002(7) (defining "Equipment" to mean "means machinery, equipment, or implements or attachments to the machinery, equipment, or implements used for, or in

incorporates by reference its prior arguments regarding the inapplicability of the Act. *Id.*

In addition, Survitec submits one additional reason that the Act does not cover the parties' dealership agreement:

## 2.   *Survitec's product are not "Equipment" under the Act as amended in 2019.*

In 2019, the Texas Legislature amended the Act to exclude "off-highway vehicles" from the Act's definition of equipment. In particular, in its current form, "Equipment" under the Act "does not mean: (i) trailers or self-propelled vehicles designed primarily for the transportation of persons or property on a street or highway; or (ii) off-highway vehicles." In other words, the Act now excludes *some* street/highway vehicles and *all* off-highway vehicles from its definition of equipment. Because FPS's legal claim for damages in this suit arises under the Act, rather than under the parties' contract, this legislative change in the Act's scope applies to this pending suit.[5]

---

connection with, any of the following purposes: (i) lawn, garden, golf course, landscaping, or grounds maintenance; (ii) planting, cultivating, irrigating, harvesting, or producing agricultural or forestry products; (iii) raising, feeding, or tending to livestock, harvesting products from livestock, or any other activity in connection with those activities; or (iv) industrial, construction, maintenance, mining, or utility activities or applications . . . .").

[5] *See Daly v. River Oaks Place Council of Co-Owners*, 59 S.W.3d 416, 423 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("What the legislature gives, it may take away, even while a plaintiff's judgment is pending on appeal. 'It is almost universally recognized that if a statute giving a special remedy is repealed, without a saving clause in favor of pending suits, all suits must stop where the repeal finds them; and, if final relief has not been granted before the repeal goes into effect, it cannot be granted thereafter. A like general rule is that if a right to recover depends entirely upon statute, its repeal deprives the court of jurisdiction over the subject matter.' (quoting *Dickson v. Navarro County Levee Improvement Dist. No. 3*, 139 S.W.2d 257, 259-60 (Tex. 1940)); *id.* (distinguishing situations where legal right in question arose from contract rather than being conferred by statute); *State v. Gibson Products Co., Inc.*, 699 S.W.2d 640, 641 (Tex. App.—Waco 1985, no writ) ("A case may also become moot when new legislation or acts are passed while a case is pending on appeal which supersede existing legislation.").

The products that are the subject of the parties' agreement comprise Survitec marine safety and survival rafts and parts.  Because such rafts are used to transport people on water, they are a form of watercraft, and thus constitute vehicles under the common meaning of those term.[6] Further, it is indisputable that Survitec's rafts are not highway vehicles.  Thus, the Act does not apply to Survitec's rafts.

**B.      The Act would constitute unconstitutional retroactive legislation under the Texas constitution if applied to the parties' dealership agreement.[7]**

The parties' dealership agreement allowed for termination by either party without cause.  But the Act precludes a manufacturer from terminating a dealership agreement with a supplier except "for cause."  Application of the Act to the parties' agreement would thus constitute the retroactive application of state law because the parties' agreement predated the effective date of the Act and continued past that date without alteration until terminated by letter dated August 15, 2017, effective December 27, 2017.

Under Texas law, however, retroactive legislation is presumed to be unconstitutional.  Thus, it is FPS's burden to rebut that presumption based on the test set forth in *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 138 (Tex. 2010).  As next explained FPS cannot do so, and the Act therefore cannot be applied to the parties' agreement.

---

[6] *See, e.g.*, Merriam-Webster Online Dictionary (defining "raft" to include "a flat structure . . . for support or transportation on water"; defining "watercraft" to include "craft[s] for water transport"; and defining "vehicle" to include "a means of transporting something"), *available at* www.merriam-webster.com.

[7] Survitec also incorporates by reference the arguments made in its earlier Rule 56 / Rule 52(c) motion on this issue.  *See supra* note 2.

*1.      The Act*

In 2011, the Texas Legislature enacted the Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act ("Act"), effective September 1, 2011. TEX. BUS. & COM. CODE § 57.001 *et. seq*.; H.B. 3079, 82nd Leg., Reg. Sess. (Tex. 2011), ch. 1039, § 4(a)(2).

Under the Act, a supplier cannot terminate its dealership contract with a [non-single-line] dealer except for "good cause." Act § 57.154. The Act defines "good cause" to include:

> "[a dealer's] fail[ure] to substantially comply with essential and reasonable requirements imposed on the dealer under the terms of the dealer agreement, provided that such requirements are not different from requirements imposed on other similarly situated dealers either by their terms or by the manner in which they are enforced."

Act § 57.154(a)(1).[8]  In addition, the Act requires that a supplier give a dealer 180 days' notice before termination and further requires that the notice of termination both state the reasons constituting good cause and provide the dealer with a 60-day cure period. Act § 57.155(a).

As can be seen, if the Act were applied retroactively to a simple at-will contract with few other terms, the Act would entirely eliminate a supplier's prior power to terminate based on (1) any general dissatisfaction with the dealer's performance <u>or</u> (2) for business

---

[8] The Act provides other instances of "good cause," including situations involving changes of dealer ownership or control, dealer relocation, dealer insolvency, dealer conviction of a crime, dealer financial default, and dealer cessation of business. Act § 57.154(a)(2)-(10), (b).

reasons particular to the supplier, such a desire to change the business model or leave the geographic or product markets.

Consequently, for a supplier to maintain any practical ability to terminate a dealer, a supplier must reach an agreement with the dealer that defines the dealer's performance obligations in great detail, anticipating as many contingencies as possible and essentially micromanaging the supplier, while also imposing all of those requirements on all other similar-situated dealers of the supplier.  Even then, however, it would not be possible to protect the supplier's ability to terminate for supplier-side reasons (*e.g*., changing its business model, withdrawing from the local market).  In addition, the Act specifically prohibits any attempt to contract around its terms.  Act § 57.003 ("An attempted waiver of a provision of this chapter or of the application of this chapter is void").

The Act specifically provides that it applies to contracts entered after the Act's effective date (September 1, 2011) or to "a dealer agreement that was entered into before the effective date of this Act, has no expiration date, and is a continuing contract." H.B. 3079, 82nd Leg., Reg. Sess. (Tex. 2011), ch. 1039, § 4(a)(2).  As next explained, the Act would be unconstitutional if applied to the parties' dealership agreement under Article I § 16 of the Texas Constitution.

**2.      *The Act is unconstitutional if applied to the parties' agreement.***

*a.     The Act is retroactive.*

The term "retroactive" means "[e]xtending in scope or effect to matters which have occurred in the past; retrospective." *Robinson v. Crown Cork & Seal Co., Inc*., 335 S.W.3d 126, 138 (Tex. 2010).  Thus, "[a] retroactive law is one that extends to matters that occurred

in the past." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014) (citing *Robinson*, 335 S.W.3d at 138).

Here, Act is retroactive by definition.  In particular, the Act expressly provides that it applies to "a dealer agreement that was entered into before the effective date of this Act, has no expiration date, and is a continuing contract." H.B. 3079, 82nd Leg., Reg. Sess. (Tex. 2011), ch. 1039, § 4(a)(2).

Thus, although Survitec's *termination* of FPS post-dated the Act, Survitec acquired its relevant contractual rights under the parties' agreement prior to the Act.  The Act's impact on those pre-existing rights thus constitutes a retroactive application of the Act.  *See Bob Tatone Ford, Inc. v. Ford Motor Co*., 197 F.3d 787, 792 (6th Cir. 1999) (holding under Ohio law that a dealer protection statute retroactively impaired a contract because "[the supplier] acquired its rights under the contract when the parties executed the agreements and not when [the supplier] exercised those rights").

Put another way, by changing the parties' agreement from "terminable at will" to "terminable only upon cause," the Act "attache[d] new legal consequences" to the parties' decision to enter a dealership agreement, which constitutes a retroactive application of law. *See Vartelas v. Holder*, 566 U.S. 257, 273 (2012) (stating that, under federal law, a statute operates retroactively when it "attaches new legal consequences to events completed before its enactment").

FPS has previously argued that a single continuing contract can be re-characterized as a series of individual contracts.  In turn, according to FPS, the parties' agreement here could be said to have ended at some point after the Act became effective and then a new

agreement between the parties arose, such that the Act's application to the new agreement would not be retroactive.

FPS's prior argument was based on dicta from a Fifth Circuit case that was never applied in that case,[9] and the undersigned is unaware of such an argument being accepted except by a Maryland court in answer to a certified question from the Eleventh Circuit. *See John Deere Const. & Forestry Co. v. Reliable Tractor, Inc*., 957 A.2d 595, 602 (Md. 2008). However, that result (itself a 4-3 decision) is a true outlier in terms of contractual construction principles, as the dissent clearly demonstrated:

> No court has held, until the Majority here, that the continuation of an at-will contract beyond the notice for termination period is the equivalent of the parties 'making' a series of independent contracts.

*Id.* at 604 (Harrell, J., dissenting) (collecting federal and state court decisions from Maine, Illinois, Minnesota, Wisconsin, South Carolina, and Ohio supporting the proposition that a contract terminable at will becomes a new contract only when parties agree to modify its material terms or renew it after a predefined expiration date).[10]

Here, there is no evidence that, after the effective date of the Act, the parties (1)

---

[9] In that case, the Fifth Circuit opined in dicta that a contract terminable by either party on 30 days' notice "might be construed as a month-to-month agreement which automatically reconducts itself each month." *Northshore Cycles, Inc. v. Yamaha Motor Co*., 919 F.2d 1041, 1043 (5th Cir. 1990) (emphasis added). The case involved a Louisiana law which the Court ultimately held violated the Contracts Clause of the federal constitution.

[10] Even the Eleventh Circuit (which had asked the certified question) criticized Maryland's answer and effectively ignored it by interpreting the contractual issue as a matter of federal common law and finding that application of the statute at issue would violate the federal Contracts Clause. *Reliable Tractor, Inc. v. John Deere Constr. & Forestry Co*. 376 F. App'x 938 (11th Cir. 2010).

modified or removed any specific term of their agreement; (2) added any specific new term; or (3) renewed the agreement after any predefined expiration date. The agreement thus was a single contract with an ongoing duration that continued in force until Survitec terminated it. The Act's modification of the agreement's termination provision is thus retroactive.[11]

b.   *Retroactive application of the Act to the parties' agreement violates Article I § 16 of the Texas Constitution.*

Article I § 16 of the Texas Constitution provide that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." Although this does not render the retroactive application of every law affecting contracts unconstitutional, retroactive laws are presumptively unconstitutional and this "heavy" presumption can only be overcome through a "compelling" public interest:

> "[Section 16] protects [the] settled expectation[] that rules are to govern the play and not simply the score, and [it] prevents the abuses of legislative power that arise when individuals or groups are singled out for special reward or punishment.
>
> . . .
>
> There must be a compelling public interest to overcome the heavy presumption against retroactive laws."

*Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 145-46 (Tex. 2010).  Put another way, "[t]he presumption is that a retroactive law is unconstitutional without a compelling justification that does not greatly upset settled expectations."  *Id*. at 147.

---

[11] Survitec would also distinguish the present situation from cases holding that a new period of limitations begins for each breach of certain contracts, such as loan agreements requiring periodic streams of payments.  Importantly, such holdings do not imply that a *new contract* arises with each breach; rather, they simply demonstrate that a single contract can be breached at multiple different times.

To determine if retroactive application of a particular statute is unconstitutional under Texas law, a court must balance three factors:

1. The nature of the prior right impaired by the statute.

2. The extent of the impairment.

3. The nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings.

*Id.* at 139.   As next explained, a consideration of these factors shows that the Act is unconstitutional if retroactively applied to the parties' agreement here.

    i.    The nature of the prior right impaired by the statute: here, the right was longstanding, vested, and mutual.

The right impaired by the Act was Survitec's right to terminate FPS's status as a Survitec dealer for any or no reason.  What was the nature of this right?  It was a mutual right, as either party could protect its economic interests by terminating the contract at any time.  It was a longstanding right, dating back many years.  It was a vested, rather than contingent, right.[12] And it was a fundamental right.  Indeed, it is hard to image a contractual term more fundamental to the parties' contract than their agreed basis for ending their contractual relationship.

---

[12] *Chesapeake Operating, Inc. v. Denson*, 201 S.W.3d 369, 372 (Tex. App.—Amarillo 2006, pet. denied) (the contractual allocation of production tax between royalty owner and lessee of mineral lease was vested right).  Before *Robinson*, a right's status as vested would automatically mean it could not be retroactively impaired.  *Id.* Although a right's status as vested is no longer outcome determinative alone, it nonetheless remains a factor in assessing the nature of the right in question.

ii. The extent of the impairment: here, the right was completely eliminated and there was no "grace period" to preserve it.

Under the agreement, Survitec could terminate FPS for any reason whatsoever. But the Act eliminates Survitec's right of termination by making dealership agreements terminable by a supplier only for cause, where "cause" is defined in a limited way that precludes any supplier-side issues, such as a need to change its business models or withdraw from a market. In addition, to invoke a "for cause" termination, a supplier must give 180-days' notice and a 60-day period to cure.

By forcing Survitec (but not FPS) to remain in a contractual relationship absent cause, the Act radically changes the parties' relationship. It give FPS a one-sided, quasi-property right[13] that did not previously exist, while taking away Survitec's pre-existing right to conduct its business where and with whom it wanted.

Notably, this was not simply an alteration of a remedy (like a limitation on contractual damages or the availability of attorney's fees). It was an alteration of the parties' bargained-for consideration. In particular, Survitec never agreed to be in a business relationship that would be perpetual absent specifically listed conditions established by a future Legislature. Rather, Survitec agreed to be in a relationship that could fairly be characterized as nearly the opposite of that.

FPS has suggested that parties can have no reasonable expectations with at-will

---

[13] *See Board of Regents v. Roth*, 408 U.S. 564, 576-78 (1972) (describing contractual right of discharge only for cause as a quasi-property right); *cf. Nelson v. Weatherwax*, 59 S.W.3d 340 (Tex. App.—Fort Worth 2001, pet. denied) (contract limiting discharge to good cause confers tenure).

relationships, but that is drastically wrong: they have the undeniably reasonable expectation that they will *not* be forced to remain in the relationship perpetually if circumstances arise that make the relationship no longer viable or desirable, including for reasons that might never have been contemplated at the beginning of the relationship.

Here, because the parties' agreement was terminable at will, it was possible for the parties to have a simple agreement with few material terms.  By contrast, under the Act, in order for a supplier to maintain any practical ability to terminate a dealer, a supplier must reach an agreement with the dealer that defines the dealer's performance obligations in extreme detail, anticipating as many contingencies as possible and essentially micromanaging the supplier, while also imposing all of those requirements on all other similar-situated dealers.

Of course, when the current parties entered their agreement, Survitec had no reason to expect that a detailed agreement was required to protect, even partially, its termination rights.  Further, even if Survitec had any reason to believe that, Survitec still could not have protected its ability to terminate the agreement for supplier-side reasons, such as changing its business model or withdrawing from the geographic or product markets, <u>as the Act specifically prohibits any attempt to contract around any of its terms</u>, as stated above.

FPS has tried to downplay the Act's impact on the parties' agreement ostensibly because there was a short gap between June 16, 2011 (when the Act was approved) and September 1, 2011 (when the Act went into effect).  2011 Tex. Sess. Law Serv. Ch. 1039 (H.B. 3079).  According to FPS, this gap should be construed as a "grace period" that saves the Act from constitutional challenges.

The Supreme Court of Texas has upheld statutes that eliminate certain causes of action when those statutes gave plaintiffs a period of time to file suit under the prior law before the statute takes effect.[14] Here, however, the 77 days between the Act's approval and the date it took effect <u>are not a grace period</u> because ***Survitec could not have taken any action during that time to preserve the contract rights it had acquired before the Act***.

In particular, although Survitec in theory could have terminated the parties' agreement on June 16, 2011 and then attempted in the next 77 days to negotiate a new agreement that spelled out in detail all potential dealer-side issues Survitec could think of that might arise in the future and give Survitec a reason to terminate the arrangement, even that possibility wouldn't turn the 77 day period into a grace period.

First, FPS wouldn't be required to accept the new agreement, so while it was a course of action that might have protected some contractual rights, it was not guaranteed.

Second, to be in compliance with the Act, Survitec would have had to impose and enforce those conditions on all other similarly-situated dealers, which would *change*, not *preserve*, Survitec's existing rights vis-à-vis those dealers (who, in any event, also wouldn't be required to accept new terms).

Third, Survitec ***still*** wouldn't be able to include supplier-side issues into the agreement (such as a need to change its business model or exit the market) as bases for

---

[14] *See Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 58 (Tex. 2014); *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997); *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698 (Tex. 2014); *cf. Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) (holding that state statute which increased corporate pension obligations violated federal Contract Clause, noting that the statute lacked "any provision for gradual applicability or grace periods").

termination because the Act prohibits any waiver of the Act's provisions, as explained above.

In short, the core right created by the parties' agreement – the right to maintain a simple at-will relationship – was impossible for Survitec to recreate during the gap period or thereafter. Instead, Survitec could only: (1) abandon the FPS relationship completely; (2) try to renegotiate a new, more specific contract with no assurance FPS would agree and no supplier-side protections; or (3) just be trapped by the Act in the existing agreement. The one thing Survitec could not do was keep the rights it had before.

    iii.    The nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings: here, there were no findings.

Under Texas law, "freedom of contract" is one of the most fundamental public policies:

> "As a fundamental matter, Texas law recognizes and protects a broad freedom of contract. We have repeatedly said that if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice."

*Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95-96 (Tex. 2011) (internal quotation marks omitted)).  As a result, for a law to retroactively impair legal rights and overcome the heavy presumption of unconstitutionality, the law must serve a compelling public interest, as evidenced by the Legislature's factual findings.

Here, what was the public policy behind the Act? According to the Act's sponsor, "[t]he purpose of this law is to protect dealers from changes imposed by a supplier if the

changes are substantial and negatively impact the dealer's business" and "[t]he reason this protection is needed is that dealers have no negotiating power to prevent suppliers from inserting contract language that gives the suppliers the legal right to take actions that harm a dealer's business." Tex. S. Jour., 82nd Legislature, 2011 Reg. Sess. No. 67 (May 25, 2011).

In other words, the Act's purpose was to strengthen dealers' negotiating power with respect to suppliers, as by giving dealers an unwaivable quasi-property right to be terminated only for cause.

The Legislature then declared that conferring this benefit on dealers served the broader public interest:

> "The legislature finds that the retail distribution, sales, and rental of [applicable] equipment through the use of independent dealers operating under contract with the equipment suppliers vitally affect the general economy of this state, the public interest, and the public welfare. Therefore, the legislature determines that state regulation of the business relationship between the independent dealers and equipment suppliers as contemplated in the . . . Act is necessary and that any action taken in violation of this Act would violate the public policy of this state."

H.B. 3079, 82nd Leg., Reg. Sess. (Tex. 2011), ch. 1039, § 1.

For two reasons, the above stated purpose and policy are inadequate to enable the Act to be applied to the parties' agreement:

(a)     The "public" interest was not compelling; it was special interest group politics.

It is perhaps unsurprising that a member of the state legislature would declare it important to improve the negotiating power of equipment dealers, who are likely to be local

business owners, over suppliers, who are likely to be out-of-state companies. And no doubt the Act's sponsor believed that what was good for local equipment dealers was good for Texas. Applied prospectively, this type of legislative judgment is a typical example of special interest group politics and legally acceptable.

But when retroactive legislation is involved, something more than ordinary interest group politics is required to interfere with existing contract rights, even where that interference "relatively small":

- "[T]he constitutional prohibition against retroactive laws . . . prevents the abuses of legislative power that arise **when individuals or groups are singled out for special reward or punishment**."

- "[T]he prohibition would be deprived of most of its force" if "[t]he perceived public advantage of a retroactive law" were just "balanced against its relatively small impact on private interests"

*Robinson*, 335 S.W.3d at 145-46.  Consistently, in prior Texas cases upholding retroactive legislation, the required "compelling justification" was never the favoring of one business interest over others:

In one case, the Court upheld the retroactive impairment of a landowner's right to extract unlimited ground water from the Edwards Aquifer.  *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 623, 635 (Tex. 1996).  In a second case, the Court upheld a statute that let the State terminate the parental rights of incarcerated individuals, even those convicted prior to its enactment.  *In re A.V.*, 113 S.W.3d 355, 361-62 (Tex. 2003).

In the first case, the compelling public interest was located in the Texas Constitution itself, as Article XVI § 5(a) directs the Legislature to enact statutes for the "preservation

20

and conservation of all such natural resources of the State."  And in the second case, the Legislature was acting in the best interest of a particularly vulnerable class of children.  In both cases, the state's exercises of police power were clearly valid "to safeguard the public safety and welfare." *Robinson*, 335 S.W.3d at 160.

Here, the Act doesn't preserve natural resources or protect children; it rewrites long-standing, economic relationships previously negotiated between business executives "of full age and competent understanding." *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95-96 (Tex. 2011).

Thus, even if "the end seems to justify the means," *Robinson*, 335 S.W.3d at 146-47, the protection of a subset of businesses in an industry is simply not a "compelling justification."  Rather, it is an improper use of legislative power that "arise[s] when individuals or groups are singled out for special reward or punishment."  *Id*. at 145.

Indeed, even under the federal Contract Clause, which is <u>more</u> deferential to legislative determinations with respect to private contracts,[15] "leveling the playing field between manufacturers and dealers," as by equalizing the parties' bargaining power, "is expressly prohibited as a significant and legitimate public interest" that would justify impairment of manufacturers' rights under existing contracts.  *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842, 860-61 (8th Cir. 2002) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978)).

---

[15] *Energy Reserves Group, Inc. v. Kansas Power & Light Co*., 459 U.S. 400, 412-13 (1983) (in a federal Contract Clause challenge to a statute whose "sole effect [is] to alter contractual duties," courts "defer to legislative judgment as to the necessity and reasonableness of a particular measure," unless "the State itself is a contracting party").

(b)     The Legislature's passage of the Act was unsupported by any factual findings.

As shown above, the Act itself states that regulating "the business relationship between the independent dealers and equipment suppliers" was necessary for the public interest.  And the Act's sponsor stated that the purpose of the Act was to address dealers' lack of negotiating power. But neither of those bare statements constitutes "factual findings," as required under *Robinson*.

In particular, the Legislature did not hold any hearings or consider any evidence before passing the Act.   Thus, the Act's statement of public policy is a conclusory statement, not a factual finding.  Likewise, although its sponsor made superficially factual statements (*e.g.*, "dealers have no negotiating power . . ."), those statements were unsupported by any evidence and, more fundamentally, were never the subject of any factual finding by the Legislature itself.  And neither conclusory statements nor statements unsupported by evidence could ever be said to constitute legislative "factual findings," as required to support a finding of constitutionality. *See Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 149 (Tex. 2010) (legal balancing test requires consideration of "the nature and strength of the public interest served by the statute *as evidenced by the Legislature's factual findings*" (emphasis added)); *id.* (weighing the fact that "[t]he Legislature made no findings to justify Chapter 149" in ruling that provision unconstitutional).[16]

---

[16] The Court in *Robinson* also criticized the statement made by the principal House sponsor of Chapter 149 as "fail[ing] to show how the legislation serves a substantial public interest." *Id.* at 149. To be clear, however, that Court did not suggest that a more specific sponsor statement could itself substitute for legislative factual findings. *Cf. also Sable*

*     *     *

Consistent with the above analysis, another judge in this district previously found that the Act was unconstitutional under Article I § 16 of the Texas Constitution when applied to a dealership agreement pre-dating the Act. *See Associated Mach. Tool Techs. v. Doosan Infracore Am., Inc.*, No. 4:15-CV-2755, 2015 WL 13660130, at *1 (S.D. Tex. Nov. 24, 2015) (unpublished).[17] The issue in that case was the very same as this one: whether the Act could retroactively impose a unilateral "for cause" termination requirement on an at-will dealership agreement. The court ruled that it could not because of the substantial impairment of settled expectations that would result:

> "Allowing the [Act] to amend the [parties' agreement] would upend both parties' 'settled expectations' that the contract would be enforceable as written. . . . The impairment of these rights is a substantial one, as it prevents [the supplier] from ever terminating the [parties' agreement] without good cause. Section 57.203 of the Act lists various examples of 'good cause,' all of which require some sort of action by the dealer. Under this rule, it would seemingly be impossible for [the supplier] to ever implement its change in business model in Texas.

---

*Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 129-30 (1989) (declining to rely on a legislative conclusion where the congressional record lacked relevant legislative findings beyond "conclusory statements" by proponents of the bill and similar bills); *id.* at 130 (stressing that "the congressional recorded . . . contains no evidence" or even a "considered judgment" on the relevant issue); *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring in judgment) ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. Congress' findings must be supported by a 'rational basis' and are reviewable by the courts.").

[17] The district court's decision was appealed, but the parties settled before any final appellate determination.

*Id*. at *3-4.[18]

## VII.   Conclusion

For the above reasons and those previously presented, the parties' agreement falls outside the scope of the Act because Survitec's marine survival and safety life rafts are not "equipment" under the Act.

Alternatively, retroactively applying the Act to the parties' agreement violates Article I § 16 of the Texas Constitution because doing so wipes out Survitec's contractual right to an open-ended relationship with FPS terminable at any time for any reason, while giving Survitec no opportunity to preserve that right on an ongoing basis, yet allowing FPS to keep its prior termination rights.  This violates the public policy embodied in  Article I § 16 of the Texas Constitution—*i.e.*, that competent parties be free to determine their relationship by contract without retroactive interference by statute—and otherwise furthers no compelling public interest.

Based on either of the above arguments, the Court should dismiss FPS's claims against Survitec because all are premised on the applicability of the Act to the parties' pre-Act agreement.  Survitec also respectfully requests all such other and further relief to which it may be entitled.

---

[18] Other federal courts have found similar state laws invalid under state and federal constitutional challenges.  *See Bull Int'l, Inc. v. MTD Consumer Grp., Inc*., 654 Fed. App'x 80, 84 (3d Cir. 2016) (decided under the Retroactivity Clause of the Ohio constitution; collecting cases); *Jack Tyler Eng'g Co. v. SPX Corp*., 294 Fed. App'x 176, 180 (6th Cir. 2008) (decided under the Contracts Clause of the Tennessee constitution); *Cloverdale Equip. Co. v. Manitowoc Eng'g Co*., 149 F.3d 1182 (6th Cir. 1998) (unpublished) (decided under the federal Contracts Clause).

Respectfully submitted,

**The McLauchlan Law Group PLLC**

By:    /s/ Peter A. McLauchlan
        **Peter A. McLauchlan**
        Attorney-in-Charge
        Texas State Bar No. 13740900
        Federal Bar No. 6370
        Peter@McLauchlanLawGroup.com
        950 Echo Lane, Suite 250
        Houston, Texas 77024
        Telephone and Fax: (832) 966-7210
        **David C. McLauchlan**
        Of Counsel
        *pro hac vice*
        Illinois State Bar No. 1855166
        David@McLauchlanLawGroup.com
        The McLauchlan Law Group LLC
        401 N. Michigan Avenue, Suite 1200
        Chicago, IL 60611
        Telephone: 312-445-8544
        Fax: 312-445-8540

        Jeremy Gaston
        Of Counsel
        State Bar No. 24012685
        Federal Bar No. 26469
        jgaston@hcgllp.com
        HAWASH CICACK & GASTON LLP
        3401 Allen Parkway, Suite 200
        Houston, Texas 77019
        Telephone and Fax: (713) 658-9007

        ***Attorneys for Defendant Survitec
        Survival Products, Inc.***

## Certificate of Service

I hereby certify that on February 3, 2021, a true and correct copy of the above and foregoing document has been served electronically through the Court's ECF electronic filing system, pursuant to the rules of Court, on counsel for all parties of record as follows:

Scott Matney, Esq.
Attorney-in-Charge
State Bar No. 24010747
S.D. Tex. Federal Court No. 23671
8050 Harrisburg Blvd.
Houston, Texas 77012
Main: (713) 924-9600
Direct: (713)-924-9617
Fax:    (713)-924-9651
Email:  smatney@fps-usa.com
Counsel for Plaintiff,
Fire Protection Service, Inc.


*/s/ Peter A. McLauchlan*
Peter A. McLauchlan
Attorney-in-Charge
Counsel for Defendant,
Survitec Survival Products, Inc.