United States District Court
Southern District of Texas
**ENTERED**
July 18, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

FIRE PROTECTION SERVICE, INC., §
§
   Plaintiff-Counterclaim Defendant, §
§
v. §    CIVIL CASE NO. H-19-2162
§
SURVITEC SURVIVAL PRODUCTS, §
INC., §
§
   Defendant-Counterclaimant. §

**MEMORANDUM AND OPINION
ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     This case has already been the subject of motions, a bench trial in front of a district judge cut short by a successful Rule 52(c) motion, an appeal, and a remand—leading to the pending motion before the undersigned (the first judge having retired). Survitec Survival Products, a manufacturer and supplier of maritime safety products, has filed a renewed motion for judgment on the partial findings of the first district judge, (Docket Entry No. 102), arguing that the products Survitec supplied to a former dealer, Fire Protection Service, were not "equipment" under the Texas Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act. TEX. BUS. & COM. CODE § 57.001 *et seq.* The court agrees and enters the following findings of fact and conclusions of law granting the motion.

**I.       Findings of Fact[1]**

     Neither party seeks reconsideration of the findings of fact and partial judgment the district judge then presiding over this case entered on February 12, 2021. The parties' briefs present a legal question that does not require the judge now assigned to the case to consider additional

_____

[1] Any findings of fact that are also or only conclusions of law are so deemed. Any conclusions of law that are also only findings of fact are so deemed.

evidence.  This court adopts the findings of fact set out in the partial judgment opinion, (Docket

Entry No. 68), which is summarized and supplemented below.

The judge who earlier presided over the case granted Survitec's previous motion for partial

judgment on the findings of fact the court entered after a bench trial.  (Docket Entry No. 68).[2]  That

motion sought a partial judgment determining whether the Texas Fair Practices Act, which came

into effect after the formation of the parties' oral agreement, (*id.* at 1–2), retroactively applied to

the parties' subsequent dispute.  (*Id.* at 6).  The judge held, based on the Texas Constitution art. I,

§ 16, that the Act did not apply.  (*Id.* at 16).  The judge did not reach Survitec's argument that the

products in question were not "equipment" under the Fair Practices Act.  Fire Protection appealed,

and the Fifth Circuit certified the question of the Act's retroactivity to the Texas Supreme Court.

(Docket Entry No. 95).  The Texas Supreme Court held in *Fire Protection Serv., Inc. v. Survitec*

*Survival Prods., Inc.*, 649 S.W.3d 197 (Tex. 2022), that the Act could be retroactively applied. The

Fifth Circuit accordingly reversed the judgment of the district court and remanded.  (*Id.*).  The

Fifth Circuit did not fault any of the district court's factual findings, and neither the Texas Supreme

Court nor the Fifth Circuit decided any other legal issue—including the question of whether the

products in question were "equipment" under the Texas Fair Practices Act.  That is the question

now before this court.

In the late 1990s, Fire Protection became an authorized dealer and servicer of Survitec's

life rafts and related equipment under an oral agreement.  Either party could terminate that

agreement without cause.  In August 2017, Survitec sent a letter to Fire Protection terminating the

agreement effective December 2017.  Fire Protection demanded that Survitec repurchase the

unsold inventory, pointing to the Texas Fair Practices Act as the justification for its demand.  The

---

[2] The court's previous opinion contains a full discussion of the procedural posture of this case.

Act, which became effective in September 2011, regulates oral or written dealer agreements "that provide[] for the rights and obligations of the parties with respect to the purchase or sale of equipment or repair parts." TEX. BUS. & COM. CODE § 57.002(4) (defining "dealer agreement").

The Texas Fair Practices Act obligates suppliers of covered "equipment" to a dealer to repurchase unsold inventory of this equipment after the supplier terminates the dealer agreement. *See id.* § 57.353. The definition is as follows:

> In this chapter:
>
>  . . . .
>
> (7) "Equipment":
>
>> (A) means machinery, equipment, or implements or attachments to the machinery, equipment, or implements used for, or in connection with, any of the following purposes:
>>
>>> (i) lawn, garden, golf course, landscaping, or grounds maintenance;
>>>
>>> (ii) planting, cultivating, irrigating, harvesting, or producing agricultural or forestry products;
>>>
>>> (iii) raising, feeding, or tending to livestock, harvesting products from livestock, or any other activity in connection with those activities; or
>>>
>>> (iv) industrial, construction, maintenance, mining, or utility activities or applications; and
>>
>> (B) does not mean:
>>
>>> (i) trailers or self-propelled vehicles designed primarily for the transportation of persons or property on a street or highway; or
>>>
>>> (ii) off-highway vehicles.

*Id.* § 57.002. Survitec argues that the products that it supplied Fire Protection do not meet the definition of "equipment" and are not subject to the Act's buyback provisions.

Fire Protection points out that Survitec's motion refers to "life rafts," despite the fact that the equipment at issue consists of more than life rafts. But Fire Protection does not distinguish

3

life rafts from other products that Survitec provided to Fire Protection. (*See* Docket Entry No. 106 at 12 (arguing that Survitec "conveniently omits the fact that it supplies (and [Fire Protection] sold as a dealer) not just life rafts, but other equipment as well," but not explaining why life rafts are different.). Fire Protection has not attempted to show why, even if the court agreed with Survitec's position with respect to life rafts, other products at issue may still be covered "equipment."

## II.     Conclusions of Law

### A.     The Law of the Case Doctrine and Survitec's Alleged Admissions

Fire Protection argues that Survitec's renewed motion presents an issue that the former presiding judge decided in Fire Protection's favor. (Docket Entry No. 106 at 2 ("This Court has expressly found, numerous times, that the Texas Fair Practices Act does indeed apply to this dispute and rejected the exact same arguments . . . .")). Fire Protection points to Survitec's motion to dismiss, (Docket Entry No. 5), motion for partial summary judgment, (Docket Entry No. 23), second motion for partial summary judgment, (Docket Entry No. 32), and motion for directed verdict, (Docket Entry No. 62).

The court previously declined to rule on whether the Act, as a matter of law, covers the products at issue. (Docket Entry No. 8 at 6 (opinion on motion to dismiss); Docket Entry No. 26 at 7 (opinion on motion for partial summary judgment); Docket Entry No. 39 (summary denial of successive summary judgment motion); Docket Entry No. 68 (memorandum granting motion for judgment on partial findings) (granting judgment without reaching the issue of "equipment")). The strongest language from the court appears in its opinion on Survitec's first motion for partial summary judgment. (Docket Entry No. 26 at 7) ("[T]he Court concludes without reservation that the Survitec life rafts are "equipment" for purposes of the Act's applicability.").

Fire Protection points to the court's statements during the bench trial chastising Survitec for attempting to raise the "equipment" question again and characterizing the determination that

the Texas Fair Practices Act applied to its products as the "law of the case." (Docket Entry No. 106 at 5 (quoting Docket Entry No. 70 at 27:23–28:6)).

The law of the case doctrine "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand." *United States v. Bazemore*, 839 F.3d 379, 385 (5th Cir. 2016) (quoting *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) (per curiam)). The doctrine is consistent with, and reflects, the rule that a trial court is bound by the decisions of the appellate court. But "[i]f a matter is merely left open" by the court of appeals, "the lower court is free to reconsider its own earlier determination if it wishes." CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478.3 (3d ed.). The Fifth Circuit did not rule on the issue of law presented here and did not disturb the district court's relevant factual findings. The law of the case doctrine does not prevent renewed consideration of whether the products at issue are "equipment."

Fire Protection argues that Survitec has admitted that the Texas Fair Practices Act applies to the repurchase claims relating to the life rafts, pointing to Survitec's answer and amended answer to Fire Protection's original state court petition and Survitec's first motion for summary judgment. (Docket Entry No. 106 at 4, 7). Survitec's answers to Fire Protection's original petition, (Docket Entry No. 1-2), have been superseded by its responses to the amended complaint, (Docket Entry No. 16). The paragraphs that Fire Protection points to in Survitec's motion for summary judgment do not make the concessions Fire Protection asserts. These paragraphs merely preview Survitec's arguments that the phrase "in connection with" should be narrowly construed and that the Act does not apply to this case. (Docket Entry No. 24 ¶¶ 13, 17–18). Survitec has not admitted that Fire Protection's position is correct or otherwise waived the arguments presented in its motion. Survitec may defend itself by offering alternative arguments, including statutory interpretations.

(Docket Entry No. 106 at 8 (Fire Protection notes that Survitec had raised other arguments in its trial brief)).   The issue is whether Survitec's products are "Equipment" under the Texas Fair Practices Act.   The parties have not pointed to authority, and the court has found none, directly addressing this question.

**B.      The Scope of the Texas Fair Practices Act**

**1.       "Terrestrial" Applications**

Survitec's broadest argument for why the Act does not apply to the life rafts is that the Act describes only "terrestrial" applications and exclusions and therefore applies only to "terrestrial" activities and equipment.

> Given the terrestrial nature of all of these specific statutory inclusions and exclusions, it is unreasonable to construe other listed purposes as reaching maritime activities, even if arguably less specific (e.g., "industrial," "mining"). This follows from the "*noscitur a sociis*" canon, where courts "avoid ascribing to one word a meaning so broad that it is incommensurate with the statutory context."

(Docket Entry No. 102 at 20 (citation omitted).   Survitec also notes that federal law commonly regulates maritime activities, and that another Texas statute, the Boat Act, TEX. OCC. CODE § 2352.001 *et seq.*, regulates certain maritime dealer agreements.   While federal maritime law may often preempt state regulations, Survitec does not point to a specific federal law that preempts the Texas Boat Act's regulation of dealer agreements involving products for maritime use.

The Texas Fair Practices Act's definition of "Equipment" is not limited to "machinery, equipment, or implements or attachments … used for, or in connection with," terrestrial pursuits or applications.   Some of the listed purposes appear to be land-bound, such as lawn maintenance. But, as Texas pointed out in its amicus brief to the Supreme Court of Texas, some shipboard beautification efforts may be considered "landscaping."   Amicus Br. of State of Texas, 2022 WL 894638, at *17, *Fire Protection Serv., Inc. v. Survitec Survival Prods., Inc.*, No. 21-1088 (Tex.). Additionally, the Act covers products related to the "raising, feeding, or tending to livestock,…or

any other activity in connection with those activities."  Livestock may be transported via ship.  The final category of purposes for which "equipment" may be used is broad: "industrial, construction, maintenance, mining or utility activities or applications."   All of these may take place on- or underwater as well as on land.

The Act excludes certain items from the definition of "equipment," including "trailers or self-propelled vehicles designed primarily for the transportation of persons or property on a street or highways," and "off-highway vehicles," § 57.002(7)(B).  Life rafts do not appear to be covered by the Texas Boat Act, which regulates manufacturer-dealer agreements with respect to "boats." TEX. OCC. CODE § 2352.001(1).  Survitec's life rafts are "vessels," *id.* § 2352.001(9) (referencing TEX. PARKS & WILD. CODE § 31.003), but life rafts are excluded from the Boat Act's definition of "boats," because they are neither motorized nor sailboats of more than 14 feet in length.  (Docket Entry No. 102 at 24 (citing *id.* § 2352.001(2))).  Because life rafts are not "boats," Survitec points to the State of Texas' argument that:

> [The Boat Act] applies to agreements for the sale of "boats" as defined, but not to agreements for the sale of other vessels. Imposing requirements on some but not all vessels indicates that the Legislature excluded some vessels deliberately. Subjecting them to similar (albeit not identical) requirements under a different statutory scheme would disregard the Legislature's choice.

Amicus Br. of State of Texas, 2022 WL 894638, at *18–19 (cited in Docket Entry No. 102 at 24– 25).  But an equally plausible inference is that the Legislature imposed separate regulatory regimes on boats intended for conveyance and on vessels intended for emergency use.  The lack of coverage for life rafts in the Boat Act does not provide sufficient support for an inference that the Fair Practices Act excludes life rafts or other aquatic equipment.

### 2.    "Industrial" or "Mining" Activities

Survitec argues that life rafts are not "used for, or in connection with," any of the activities enumerated in the Act.  Survitec argues, and Fire Protection does not dispute, that the only two

statutory activities to which life rafts are plausibly related are "industrial" and "mining" activities or applications.  (Docket Entry No. 102 at 2; Docket Entry No. 106 at 6–7 ("industrial"), 8–9 ("mining")).  Fire Protection argues that the Act's use of the word "industrial" encompasses the commercial fishing "industry," in which marine life rafts may be used, and that the Act's use of the word "mining" encompasses offshore oil drilling, in which life rafts may be used.  (Docket Entry No. 106 at 6–9).

Survitec argues that Fire Protection's construction of "industrial" and "mining" improperly broadens the Act.  Survitec argues that even if "mining" encompasses oil drilling, life rafts are not "used for" oil drilling, and even if life rafts are on boats used for the commercial fishing "industry," the life rafts are not "used for" commercial fishing.  Following the same argument, if the court were to find that life rafts are "used . . .  in connection with" oil drilling or commercial fishing, that would greatly expand the definition and coverage of "Equipment" under the Act.  Survitec argues that such a broad interpretation is not supported by the statute when analyzed in its context.

Courts interpret provisions of Texas statutes "by looking to their plain language and construing the text in light of the statute as a whole." *City of Austin v. Quinlan*, ___ S.W.3d ____, No. 22-0202, 2023 WL 3767092, at *5 (Tex. June 2, 2023) (citing *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022)).  Statutory terms are given "their common, ordinary meaning unless either the text provides a different definition, or the common meaning leads to an absurd result." *Id.*; *see also* TEX. GOV'T CODE § 311.011(a) (Under Texas law, statutes "shall be read in context and construed according to the rules of grammar and common usage.").  Statutes are interpreted "with reference to the Legislature's broader statutory context." *Quinlan*, 2023 WL 3767092, at *5.  The court must "give effect to all the statute's words without treating

any language as surplusage, if possible." *Id.* (citing *Hlavinka v. HSC Pipeline P'ship, LLC*, 650 S.W.3d 483, 491 (Tex. 2022)).

"Industrial" activities or applications, without further qualification or context, may be ambiguous.  Some definitions of "industrial" are unhelpfully tautological.  *See, e.g.*, *SWEPI LP v. R.R. Comm'n of Tex.*, 314 S.W.3d 253, 266 (Tex. App.—Austin 2010, pet. denied) ("The common meaning of 'industrial' when used as an adjective means 'of or belonging to industry.'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1155 (2002)).  But "[w]ords that in isolation are amenable to two textually permissible interpretations are often not ambiguous in context." *Hegar v. Health Care Serv. Corp.*, 652 S.W.3d 39, 43 (Tex. 2022).  If a term has "multiple common meanings," the court will apply "the definition most consistent with the statutory scheme." *Id.* Only if the court is unable to determine which of multiple reasonable interpretations from the statutory context may it turn to extrinsic evidence to resolve any ambiguity. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

The Supreme Court has noted that there are "multiple definitions of the terms industrial and industry," which may "refer to business activity in general . . . [or] "economic activity concerned with the processing of raw materials and manufacture of goods in factories." *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 611 (2013) (internal quotation marks and citation omitted). Fire Protection is correct that commercial fishing and other maritime activities fall under the general definition of "industries" and may be referred to as such in common usage.  In some contexts, activities as diverse as waste disposal, newspaper printing, and dry cleaning may all be considered "industrial." *SWEPI*, 314 S.W.3d at 266 (a landfill is an "industrial use" under Chapter 92 of the Natural Resources Code); *Calvert v. Austin Laundry & Dry Cleaning Co.*, 365 S.W.2d

232, 235 (Tex. App.—Austin 1963, writ ref'd n.r.e.) (observing that courts have held dry cleaning and newspaper printing to be "industrial" operations).

The landscaping, agricultural, and livestock purposes discussed in subsections (A)(i), (ii), and (iii) of the Act could likewise be "industrial" purposes under the broad definition of that word. But the Act lists landscaping, agricultural, and livestock purposes as separate from the "industrial, construction, maintenance, mining, or utility" purposes listed in A(iv).  The Act thus defines "Equipment" to include equipment used for "industrial" purposes in (iv), but distinguishes that equipment from equipment used for (i) landscaping or ground maintenance purposes; (ii) agricultural or forestry purposes; (iii) livestock purposes; or (iv) construction, maintenance, mining, or utility purposes.  The structure of the Act implicitly limits "industrial activities or applications" to those that serve purposes other than those listed in subsections A(i) to (iii).  *See, e.g.*, *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) ("We must not interpret the statute 'in a manner that renders any part of the statute meaningless or superfluous.'") (quoting *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008)).  The definition of "Equipment," considered in full, leads the court to conclude that "industrial" should be construed as activities related to the production of goods rather than as relating generally to large-scale commercial activity.

The parties contest whether offshore oil drilling is "mining" within the meaning of the statute.  Survitec acknowledges that its life rafts are used on offshore oil platforms.  Survitec cites a Texas appellate court case that considered whether "drilling an oil well is mining 'of any character.'"  *Barton v. Wichita River Oil Co.*, 187 S.W. 1043, 1046 (Tex. App.—Fort Worth 1916, writ ref'd).  The *Barton* court acknowledged that oil is a mineral taken from the earth, like other

"mined" substances. *Id.* at 1047.  The *Barton* court also concluded that popular usage was relevant

to interpreting the statutory language:

> It had not occurred to us on original hearing that the well, upon and about which
> Claude Minor and his assignors worked, was a "mine," or that they were "miners,"
> and we feel safe in saying that ordinarily they would not be so designated, and by
> the statutory rule of construction quoted it is the ordinary, and not a strained or
> exceptional, significance that must be given the term "mine" as used in the statute,
> by virtue of which appellee claims.  It is, we think, common knowledge that an oil
> well is simply so designated, and that the one engaged in its boring or drilling is
> designated as a driller.  If this be true—and we do not think it can be gainsaid--we
> cannot designate an oil well as a mine, or the driller as a miner, without violating
> the rule of construction we are directed to follow . . . .

*Id.*  The *Barton* decision is not entirely on point.  As that court acknowledged, when the statute in

question was drafted, "such a thing as an oil well in Texas was hardly thought of, or at least was

not generally known and considered."[3]  *Id.* at 1046.  When *Barton* was issued, the contemporary

means of extracting oil from the earth at sea did not exist and were likely not contemplated by that

court.  In short, a court's statement of what was "common knowledge" in 1916 is a poor foundation

for determining the contemporary meaning of a statute that, at the time, did not exist.

In response, Fire Protection cites *Shell Petroleum Corp. v. Caudle*, 63 F.2d 296 (5th Cir.

1933), in which the court confronted whether Shell could be held liable under an alleged "mining

partnership," a partnership arising "by operation of law where co-owners work a mine."  *Id.* at

297.  In affirming the district court in part, the court of appeals held that Shell was liable.  *Id.* at

299.  In passing, and without citing authority, the court stated that "[o]il production from the earth

is to be classed as mining."  *Id.* at 297.  Fire Protection also points to *Swayne v. Lone Acre Oil Co.*,

86 S.W. 740 (Tex. 1905), which concerned whether a life tenant's opening of land for oil

production was a "new mine."  The court held that oil "is to be considered like iron, coal, lead, or

---

[3] The situation has since changed.  *Ball v. Davis*, 18 S.W.2d 1063, 1066 (Tex. 1929) (observing that oil had
become "one of the major industries of the state").

other solid mineral substances" for which a life tenant, by opening a new mine, may be held liable

for waste. *Id.* at 743.[4]

None of these venerable cases concern the Fair Practices Act.  The Fifth Circuit's opinion

in *Caudle*—Fire Protection's best authority—did not confront the type of dispute presented here

and its statement was not derived from Texas law.  This difference, along with the dearth of

contemporary cases, leads the court to consider the terms "oil" and "mining" as used elsewhere in

the Texas statutes.  These statutes distinguish between oil exploration and production on the one

hand, and the mining of other materials on the other hand.  For example, the Texas Securities Act,

TEX. GOV'T CODE § 4001.001 *et seq.*, exempts certain transactions from its scope, among them

"oil, gas, or mining leases, fees, or titles, or contracts." *Id.* § 4005.021(a).  Although the exemption

applies to both "oil" and "mining" interests, the use of both terms suggests that an "oil" interest or

activity is distinguishable from a "mining" interest or activity. *See also* TEX. PROP. CODE § 56.001

("'Mineral activities' means digging, drilling, torpedoing, operating, completing, maintaining, or

repairing an oil, gas, or water well, an oil or gas pipeline, or a mine or quarry.").  The Texas Natural

Resources Code's provisions related to "oil and gas" are contained in Title 3; provisions related to

"mines and mining" are contained in Title 4.  These statutes are evidence that, in the contemporary

context, the Texas Legislature does not equate "oil drilling" and "mining."

---

[4] Some of Fire Protection's authorities are not relevant to this dispute. *Tex. Pac. Coal & Oil Co. v. Howard*, 212 S.W. 735, 739 (Tex. App.—Fort Worth 1919, no writ), observed that oil was a mineral like other substances, albeit one with different physical characteristics. *Larey v. Wolfe*, 416 S.W.2d 266 (Ark. 1967), did not involve Texas law.  Many of the other cited cases stand for the same proposition as *Caudle*—that oil exploration may establish a "mining partnership."  Finally, Fire Protection's observation that West's classifies oil and gas cases as involving "mines and minerals," (Docket Entry No. 106 at 10), is irrelevant because West's system of "Key Numbers" is not legal authority.

### 3.    "In Connection with"

Even if the court were to conclude that the Act included equipment used in connection with oil drilling under the general term of "mining," it cannot conclude, as Fire Protection urges, that Survitec's life rafts are "used for, or in connection with," mining.  The phrase, "in connection with," itself contains no limiting principle.  As the U.S. Supreme Court has observed, "[t]he phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere,'" and the phrase "provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions."  *Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) (citations omitted).

In support of its argument that equipment used "for, or in connection with industrial [or] mining" encompasses Survitec's life raft products, Fire Protection points to *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986), as a case giving broad effect to "in connection with" language.  *Fontenot* concerned the apportionment of personal injury liability under an indemnity agreement.  The court held:

> [W]here the presence of the injured person at the scene of the injury is attributable
> to or might reasonably be anticipated by his employment responsibilities, then his
> injuries occur "in connection with" those responsibilities.

*Id.* at 1215.  The court made this decision under maritime, not Texas, law.  Nonetheless, the Fifth Circuit's reasoning does not endorse the breadth advocated by Fire Protection.  Rather, it limits the phrase "in connection with" to those injuries "attributable to or might reasonably anticipated by" the employee's responsibilities.

The interpretation of "in connection with" is the subject of court of appeal's decision in *Titan Transp., LP v. Combs*, 433 S.W.3d 625 (Tex. App.—Austin 2014, pet. denied).  The dispute in the *Titan* case concerned a former provision of the Texas franchise-tax statute:

> A taxable entity shall exclude from its total revenue, to the extent [reported to the federal IRS as income], only the following flow-through funds that are mandated by contract to be distributed to other entities:
>
>   . . . .
>
> (3) subcontracting payments handled by the taxable entity to provide services, labor, or materials *in connection with* the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

*Id.* at 630 (emphasis added) (citation omitted). The plaintiff, Titan, was in the "business of hauling, delivering, and depositing 'aggregate' [a combination of rock, sand, and other materials] at real-property construction sites, where it is used as an ingredient in concrete or as a foundation for the construction of roads, buildings, and parking lots." *Id.* at 629. The court rejected the state's position "that the only reasonable limit is to impose a requirement that the taxpayer's subcontractor be engaged in activities that effect a material or physical change in the property itself." *Id.* at 638. While Titan did not construct, remodel, or repair real property, its services—hauling, delivering, and depositing construction material—were sufficiently "in connection with" these activities to allow Titan to qualify for the tax treatment it sought. Although the court found a broad reading of the "in connection with" language appropriate, it emphasized that "some reasonable nexus" was required between Titan's services relating to the materials it delivered to construction sites and the activities that effected a change in the real property. *Id.*; *see also Banner Sign & Barricade, Inc. v. Berry GP, Inc.*, No. 13-07-00596-CV, 2008 WL 4352634, at *5 (Tex. App.—Corpus Christi–Edinburg Sept. 25, 2008, pet. denied) (stating that terms such as "in connection with" "require only that a 'general nexus' be established between the subcontractor's obligations and the detriment for which indemnity is sought.").

The *Titan* court confronted the state's argument, similar to Survitec's argument here, that to accept Titan's position would mean that the delivery of anything at all to a construction site

would make the company delivering the materials qualify for favorable treatment that the statute provided only for companies engaged in activities that effected a material or physical change in the property itself. *Titan*, 433 S.W.3d at 638.  The court responded by emphasizing the "reasonable nexus" requirement, stating that a courier service with no knowledge of the goods being delivered would "unlikely . . . be able to establish anything other than the most tangential relationship between the courier services provided and the activities listed." *Id.* at 639.  The court added, "[w]e are also not persuaded that absurd consequences necessarily ensue from the plain language of the statute based on the mere possibility that a courier service could theoretically qualify for the [benefit] to the extent of any deliveries to construction sites." *Id.*  To summarize: "in connection with" requires "some reasonable nexus" between the service or thing provided and the activity identified by the statute.

Survitec argues that, because "life rafts are not used to remove minerals from the earth," they do not have a "mining" function.  (Docket Entry No. 102 at 19).  *Titan* does not announce a rule as narrow as Survitec proposes.  For example, equipment used to help locate minerals under the earth would be used in "mining" activities even if the equipment did not itself remove the minerals from the earth.  There is a sufficient nexus between the equipment used to locate the minerals and the mining of those minerals.  Even if the equipment might also be used to locate items besides minerals, or perform activities lacking a connection to mining, there is still a sufficient nexus between the equipment and the mining application to fall within A(iv) of the Act. The phrase "in connection with" does not support the argument that the statute is so narrow as to limit "equipment" to products whose sole uses are within the enumerated categories.

The court in *Titan* looked to the specific item or product and the service at issue.  The same service or product may have several uses or applications.  Marine life rafts are routine, and often

15

required, in a variety of maritime industries, including offshore construction and maintenance, offshore oil drilling, undersea mining, or work on utility lines that are over or under bodies of water.  But Fire Protection has not pointed to facts showing that providing marine life rafts has a sufficient nexus with any of the A(iv) activities or applications to make the rafts "Equipment" under the Act.  The fact that marine life rafts are often, even required, to be present when offshore industrial activities, offshore construction, maintenance, mining, or other activities or applications are performed, does not mean that the rafts themselves are used in those activities or applications.  As Survitec notes, the same could be said of any number of both quotidian and specialized products.  There is no indication that the statutory language sweeps as broadly as Fire Protection argues.

## III.    Conclusion

The court grants Survitec's renewed motion for judgment on partial findings.  (Docket Entry No. 102).  The life rafts are not "Equipment" under the Texas Fair Practices Act.  As a result, the parties' dealership agreement is outside the scope of the Act, and Fire Protection's claims are dismissed.

SIGNED on July 18, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

16